UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PHILIP SCOTT CANNON, MATHIAS
CANNON, AND PHILIP SCOTT
CANNON, on behalf of his minor child, QC,

Plaintiffs,

v.

POLK COUNTY/POLK COUNTY SHERIFF,
CITY OF DALLAS/DALLAS POLICE
DEPARTMENT, BURNETTE KRAUGER, KERRY
TAYLOR, MICHAEL OJA, JOHN WALLACE,
MICHAEL HOLSAPPLE, PAUL BOX,
RAY STEELE, BOB WOLFE, CHAD WOODS,

Defendants.

Case No. 3:10-cv-00224-HA

OPINION AND ORDER

HAGGERTY, District Judge:

Plaintiffs, Phillip Scott Cannon, Mathias Cannon, and Phillip Scott Cannon on behalf of

his minor child, QC, filed this law suit, alleging violations of 42 U.S.C. § 1983 against Polk

County Sheriff Robert Wolfe, former Polk County Sheriff Ray Steele, Polk County Sheriff's

Deputy Michael Holsapple, retired Polk County Deputies Burnette Krauger and Paul Box, City of

Dallas Police Officer John Wallace, and former City of Dallas Reserve Officer Chad Woods in

connection with their investigation of plaintiff Phillip Scott Cannon[1] for a triple murder in 1998. Plaintiffs allege that the manner in which these individual defendants conducted their investigation and prosecution violated plaintiffs' constitutional rights. Plaintiffs also allege state law claims against Polk County and the City of Dallas for malicious prosecution and abuse of process.[2] In addition to these claims against the Polk County/City of Dallas defendants, plaintiffs allege that Oregon Department of Justice Special Agent Kerry Taylor and Oregon State Police Officer Michael Oja ("State defendants") violated 42 U.S.C. § 1983 through their role in the investigation. On October 30, 2014, the State defendants and the Polk County/City of Dallas defendants separately filed Motions for Summary Judgement [201], [203]. Based on the following analysis, both motions are granted.

## FACTUAL BACKGROUND

In November 1998, Jason Kinser, Suzan Osborne, and Celesta Graves were living in the mobile home located on the property of Bimla Boyd and Charles Boyd in Polk County, Oregon. The Boyds lived in a house overlooking the mobile home on the same property.

On November 23, 1998, Kinser, Osborne, and Graves experienced plumbing problems at the mobile home and were without running water. Graves called plaintiff, who was a friend, to come to the trailer to estimate the cost of plumbing repairs. Plaintiff responded to the mobile home, driving a maroon van.

---

[1]  The court will refer to Phillip Scott Cannon as "plaintiff" throughout this Opinion and Order, as the facts and allegations focus largely on his actions in relation to defendants' investigation.

[2]  Polk County, the City of Dallas, and their respective employees will be collectively referred to as "Polk County/City of Dallas defendants" throughout this Opinion and Order.

Bimla Boyd said that that afternoon she had made several car trips up and down her long driveway, which she shared with the mobile home. She had noticed the maroon van parked outside the mobile home. On one trip up the driveway, Boyd's car was stopped by a tree branch that lay on the ground, blocking her way. As she was stopped, Jeremy Olsen and Larry Weaver pulled into the driveway behind her in a yellow pickup truck. Boyd was not familiar with Olsen and Weaver, but she lent them her phone to speak with the mobile home tenants. Olsen and Weaver were able to speak with Osborne, but the tenants did not offer to help remove the branch. Olsen and Weaver cleared the branch from the driveway on their own. Boyd drove up to her house and the two men followed her as far as the mobile home.

Before Olsen and Weaver arrived at the mobile home, plaintiff claims that he had examined the plumbing problem and had spoken with Graves and Osborne. He states that he observed Kinser speaking tensely with a Hispanic man inside the mobile home, and shortly thereafter Osborne advised plaintiff to leave. Plaintiff was packing his tools in his van when Olsen and Weaver arrived. Olsen and Weaver stated that they were delivering water to Kinser. According to Olsen and Weaver, plaintiff acted strangely and advised them that they should not go into the mobile home because Kinser was upset. The parties' accounts of what happened during this encounter differ, but, most significantly, Olsen and Weaver eventually acknowledged that plaintiff did not want them to enter the mobile home, and they left the property. Plaintiff claims that he finished loading his van and also left the property.

Later that afternoon, police received a emergency call from Boyd. Police arrived to Boyd's property and discovered the mobile home partially on fire, because ignited logs from the wood stove were on the floor. Kinser lay dead on the kitchen floor, and the bodies of Osborne

3- OPINION AND ORDER

and Graves lay under the mobile home. Each of the victims had suffered a gun shot wound to the back of the head from close range.

The Polk County Major Crimes Team was activated to investigate the murders. Polk County Deputy Holsapple was assigned as the lead investigator, and Deputy Krauger was assigned to lead a team in the collection of evidence. Holsapple assigned Deputy Box and Deputy Krauger to speak with Boyd and her neighbors. Boyd stated that she observed smoke coming from the mobile home as she left her house to pick up her children that afternoon. Because the tenants were not permitted to use the wood stove, she investigated. Boyd claimed that, upon entering the mobile home, she observed Kinser on the kitchen floor, grasping for air, and she called the police.

On the following day, November 24, 1998, the Major Crimes Team interviewed several individuals that they suspected may have had information about the murders. Law enforcement was familiar with Kinser due to his involvement in methamphetamine manufacture and distribution. Weaver and Olson were interviewed and they described their encounter with plaintiff as they attempted to deliver water to the mobile home. Sarah Miller, plaintiff's girlfriend, explained that plaintiff returned home at 4:00 pm on the day of the murders. Steven Brobston, an inmate at Marion County Jail and a known drug trafficker, reported that he entrusted plaintiff with sixteen thousand dollars in a metal lock box to support his girlfriend, Graves, while he was in custody. Law enforcement also learned that plaintiff was a methamphetamine user and convicted felon.

4- OPINION AND ORDER

Based on this information, Deputy Holsapple, Sergeant Simpson, Sheriff Steele, and Polk County District Attorney Fred Avera concluded that the Major Crimes Team had probable cause to arrest plaintiff for the murders. On the afternoon of November 24, 1998, plaintiff was arrested and interviewed at the Polk County Sheriff's Office. The Polk County/City of Dallas defendants claim that, during that interview, plaintiff was untruthful regarding his drug use, his association with the victims, and his financial relationship with Brobston.

Law enforcement obtained a search warrant for plaintiff's home. There, they seized various firearms, ammunition, and home-made silencers. They also located Brobston's metal lock box, which was empty.

On December 3, 1998, plaintiff was indicted for three counts of Aggravated Murder and for Felon in Possession of a Firearm. Plaintiff remained in custody pending his trial, which began on January 24, 2000. On February 28, 2000, the jury returned its verdict, finding plaintiff guilty of all charges. The Oregon Court of Appeals affirmed plaintiff's conviction without opinion on July 31, 2002. The Oregon Supreme Court denied plaintiff's petition for review on January 22, 2003.

On January 12, 2004, plaintiff filed a Petition for Post-Conviction Relief. At that time, the State conceded that scientific evidence used in plaintiff's criminal trial, comparing the chemical composition of bullets found at the crime scene, was unreliable. A Stipulated Judgment granted plaintiff post-conviction relief on September 2, 2009, and plaintiff's convictions for aggravated murder were set aside.

5- OPINION AND ORDER

While preparing for plaintiff's new criminal trial, the State discovered that the original trial exhibits had been lost during the appeals process. On December 18, 2009, the aggravated murder charges against plaintiff were dismissed, and plaintiff was released from incarceration. An investigation by the Oregon Department of Justice concluded that the Polk County Sheriff's Office had destroyed the evidence. In 2010, plaintiffs filed the present action, alleging violations of 42 U.S.C. § 1983, abuse of process, and malicious prosecution against the Polk County/City of Dallas defendants and the State defendants. In 2011, the evidence was found in the State's possession.

## STANDARDS

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *Bahn v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). The moving party carries the initial burden of proof and meets this burden by identifying portions of the record on file that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the non-moving party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id.*

The court must view the evidence in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (citations omitted). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *MetroPCS, Inc. v. City & County of S.F.*, 400 F.3d 715, 720 (9th Cir. 2005)

(citation omitted).  Where different ultimate inferences may be drawn, summary judgment is

inappropriate.  *Sankovich v. Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981) (citing Fed. R.

Civ. P. 56(c)).

In order Deference to the non-moving party has limits.  The non-moving party "must set forth

specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The "mere

existence of a scintilla of evidence in support of the [non-moving party's] position [is]

insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Where "the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

587 (1986) (citation omitted).

## ANALYSIS

In order to present the relevant issues in the clearest fashion, the court will first set out the

legal analysis relevant to the Polk County/City of Dallas defendants' Motion.  Then, the court

will separately address the legal analysis relevant to the State defendants' Motion.

### The Polk County/City of Dallas Defendants' Motion for Summary Judgment

Plaintiffs' First Amended Complaint alleges several surviving federal claims against the

Polk County/City of Dallas defendants.  Plaintiffs' Fifth Claim alleges that the individually-

named Polk County/City of Dallas defendants violated Cannon's Fourth and Fourteenth

Amendment rights through the loss and/or destruction of evidence; failure to investigate

exculpatory evidence; withholding discovery from defense counsel; altering evidence; cross-

contamination of evidence; failure to properly collect, document, store, photograph, videotape,

and memorialize evidence; failure to properly investigate information presented to law enforcement; and failure to supervise. Plaintiffs' Tenth, Eleventh, and Twelfth Claims allege that the individually-named Polk County/City of Dallas defendants violated the Fourteenth Amendment rights of Phillip Cannon, Mathias Cannon, and QC, respectively, through a deprivation of their associational rights. Plaintiffs also allege two state law claims against Polk County and the City of Dallas; plaintiffs' First Claim alleges malicious prosecution and plaintiffs' Second Claim alleges abuse of process.

### A.    Federal Claims Against the Polk County/City of Dallas Defendants (Claims 5, 10, 11, and 12)

In addressing their federal claims, plaintiffs argue that their allegations are best divided into four categories: allegations that the Polk County/City of Dallas defendants failed to produce exculpatory evidence prior to plaintiff's trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); allegations that they mishandled evidence in violation of *California v. Trombetta*, 467 U.S. 479, 488 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988); allegations that defendants' conduct violated substantive due process; and allegations that they unlawfully interfered with plaintiffs' associational rights.

The Polk County/City of Dallas defendants assert that they are entitled to qualified immunity on all of plaintiffs' claims. "Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine provides an immunity from suit rather than a defense to liability, *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009), and ensures that "officers are on notice [that] their conduct

is unlawful" before being subjected to suit. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In this

way, the doctrine strikes a balance between "the need to hold public officials accountable when

they exercise power irresponsibly and the need to shield officials from harassment, distraction,

and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

The Supreme Court has set forth a two-part analysis for resolving government officials'

qualified immunity claims. First, the court must consider whether the facts "[t]aken in the light

most favorable to the party asserting the injury . . . show [that] the [defendants'] conduct violated

a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other*

*grounds by Pearson*, 555 U.S. at 236. Second, the court must determine whether the right was

clearly established at the time of the alleged violation. *Id.* Even if the violated right was clearly

established at the time of the violation, the defendant is entitled to qualified immunity if his

mistake as to what the law requires is reasonable. *Id.* at 205. The court may address these two

prongs in either order. *Pearson*, 555 U.S. at 236. Whether the defendant violated a

constitutional right and whether the right was clearly established at the time of the violation are

pure legal questions for the court. *Serrano v. Francis*, 345 F.3d 1071, 1080 (9th Cir. 2003).

However, if a genuine issue of material fact exists that prevents a determination of qualified

immunity at summary judgment, the case must proceed to trial. *Id.* at 1077.

The Polk County/City of Dallas defendants argue that they are entitled qualified

immunity because the alleged actions did not deprive plaintiffs of any constitutional right; and

therefore, plaintiffs failed to satisfy the first prong of the qualified immunity test. Alternatively,

defendants argue that, even if there was a constitutional violation, the constitutional right was not

clearly established at the time of the violation. The Polk County/City of Dallas defendants set forth this argument for each of plaintiffs' *Brady* allegations, *Trombetta/Youngblood* allegations, substantive due process allegations, and allegations concerning associational rights.

### 1.    *Brady* Claims

The Polk County/City of Dallas defendants argue that none of plaintiffs' allegations constitute a violation of *Brady*. "Under *Brady*, the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *United States v. Stinson*, 647 F.3d 1196, 1208 (9th Cir. 2011), *as amended* (citation and internal quotation marks omitted). There are three components to a *Brady* violation: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." *Id.* (citation, alteration, and internal quotation marks omitted). "To determine whether prejudice exists, we look to the materiality of the suppressed evidence." *Id.* To determine if the suppressed evidence is material, "the question is whether admission of the suppressed evidence would have created a reasonable probability of a different result, so the defendant must show only that the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (citation and internal quotation marks omitted).

Under *Brady's* suppression prong, if "the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence," the government's failure to bring the evidence to the direct attention of the defense does not constitute "suppression." *Raley v.*

*Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)).  On the other hand, "[w]here a defendant doesn't have enough information to find the *Brady* material with reasonable diligence, the state's failure to produce the evidence is considered suppression. *Milke v. Ryan*, 711 F.3d 998, 1018 (9th Cir. 2013).

As the Polk County/City of Dallas defendants point out, "*Brady* does not necessarily require that the prosecution turn over exculpatory material *before* trial." *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985)).  Rather, disclosure must be made "at a time when [the] disclosure would be of value to the accused." *Id.*

Plaintiffs allege that several of the Polk County/City of Dallas defendants' actions constitute *Brady* violations.  Below, the court will analyze each of those actions under both prongs of the qualified immunity analysis.

a.    McMahon Line-Up

Plaintiffs argue that Polk County Sheriff's Deputy Holsapple and Sheriff Steele violated *Brady*, because, under their supervision, a photo line-up of Thomas McMahon was never produced to defense counsel.  McMahon was a known associate in Kinser's drug trade and, at the time of the murder, Kinser's codefendant for drug charges in Marion County.  Based on this information, Sergeant Jeff VanLaanen prepared a photo line-up that included a photo of McMahon.  The line-up was shown to Boyd in order to determine if she had seen McMahon on the property in the days preceding the murders.  Boyd could not identify McMahon.  Plaintiffs

complain that this photo line-up was not attached to Sergeant VanLaanen's incident report; and therefore not disclosed to plaintiff's criminal defense counsel, resulting in a *Brady* violation.

The Polk County/City of Dallas defendants argue that the photo line-up was not suppressed. They reason that Sergeant VanLaanen's incident report was provided to defense counsel, and, while it does not contain the photo line-up itself, it contains all of the information necessary for defense counsel to know that a photo line-up existed. Defense counsel's knowledge of the photo line-up is confirmed in his memorandum, dated February 9, 1999, which notes the photo line-up of McMahon. LeGore Decl. Ex. 16. Because defense counsel knew that the line-up existed, Polk County/City of Dallas defendants argue that the suppressed evidence would have been produced if defense counsel exercised reasonable diligence. Therefore, they argue, the line-up was not suppressed, and plaintiffs fail to satisfy the second factor of *Brady*.

The Ninth Circuit recently opined that a "prosecutor's obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence." *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir. 2014). The court explained that a prosecutor cannot avoid a *Brady* claim "by pointing to that which conceivably could have been discovered had defense counsel . . . enlarge[d] his investigations. *Id.* at 1136-37. On the other hand, "defense counsel cannot lay a trap for prosecutors by failing to use evidence of which defense counsel is reasonably aware for, in such a case, the jury's verdict of guilty may be said to arise from defense counsel's stratagem, not the prosecution's failure to disclose." *Id.* at 1135. Similarly, "defense counsel cannot ignore that which is given to him or of which he otherwise is aware." *Id.* at 1137.

In this case, obtaining the photo line-up would not have required defense counsel to "enlarge his investigation." Similarly, the photo line-up was not the type of evidence that defense counsel could only *conceivably* discover. Rather, it is clear that defense counsel was aware of the existence of the photo line-up. LeGore Decl. Ex. 16 (memorandum by defense counsel states "Presented the photo lineup with McMahon to Boyd?"). Defense counsel had an apparent opportunity to obtain the allegedly suppressed evidence, but he made a strategic decision not to pursue that line of defense. Defense counsel's stratagem cannot give rise to a valid *Brady* claim. *Amado*, 758 F.3d at 1135. Therefore, the facts alleged do not show that the Polk County/City of Dallas defendants' failure to produce the photo line-up violated plaintiffs' constitutional rights, and plaintiffs cannot satisfy the first prong of the qualified immunity test. Accordingly, defendants are awarded qualified immunity as to this claim.

           b.     Gannaway Report.

Deputy Krauger and Deputy Box interviewed Lance Ganaway on September 27, 1999. LeGore Decl. Ex. 20. Deputy Krauger did not author the report that summarized the interview ("the Gannaway Report") until November 23, 1999. According to the report, Gannaway stated that McMahon admitted to Gannaway that he committed three murders that were very similar to the murders for which plaintiff was charged. LeGore Decl. Ex. 20. Plaintiff claims that his defense counsel did not receive the Gannaway Report before plaintiff's criminal trial; and therefore, Deputy Krauger's failure to produce the report constituted a *Brady* violation.

The parties debate whether the Gannaway Report was actually produced to defendant. To support their argument that it was not produced, plaintiffs explain that Eric Mason, plaintiff's investigator for his post-conviction relief petition, conducted an evidence review at the Polk

13- OPINION AND ORDER

County Sheriff's Office in February 2009. During that review, Mason noticed that the Gannaway Report did not have a Bates number stamped on it. Plaintiffs suggest that this indicates that it was not received by the prosecuting attorney and not produced to plaintiff. Plaintiffs also reason that Mason's unfamiliarity with the name Gannaway and defense counsel's failure to conduct a follow-up interview with Gannaway suggest that the report was never produced.

In response, the Polk County/City of Dallas defendants demonstrate that the Gannaway Report was actually stamped with a Bates number. LeGore Decl. Ex 20. The report that Mason reviewed was unstamped, because it was the original evidence that remained at the Polk County Sheriff's Office, as opposed to the copy that was sent to the District Attorney and Bates stamped for production to defense counsel. LeGore Decl. Ex. 18. The presence of a Bates number indicates that the Polk County District Attorney received the Gannaway Report from law enforcement. LeGore Decl. Ex. 14 at 4.

Plaintiffs argue that, whether or not the prosecutors received the Gannaway Report, Deputy Krauger has violated *Brady*, because defense counsel did not receive the report before trial. For support, plaintiffs rely on *Tennison v. City and County of San Francisco*, which imposes a *Brady* obligation on both prosecutors and investigators. 570 F.3d 1078, 1087 (9th Cir. 2009) (citing *United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004). However, *Tenninson* merely requires that the government turn over evidence which is known only to the investigators and not to the prosecutor. *Id.* In *D'Ambrosio v. Marino*, the Sixth Circuit explained that "the role that a police officer plays in carrying out the prosecution's *Brady* obligations is distinct from that of a prosecutor." 747 F.3d 378, 389 (6th Cir. 2014). "*Brady* obliges a police officer to disclose material exculpatory evidence only to the prosecutor rather than directly to the defense."

14- OPINION AND ORDER

*Id.*  The requirement that police disclose evidence known only to the police merely imposes a

duty on prosecutors to learn of exculpatory evidence from the police.  It does not require the

police officer to disclose any sort of information-even information known only to the officer-

directly to the defense.  *Id.*  This court agrees, in that an investigator's *Brady* obligation is

satisfied when he produces exculpatory evidence to the prosecutor.

      In this case, the Bates stamp on the Gannaway Report indicates that it was produced to

the District Attorney's Office.  Therefore, even if the report was not produced to defense counsel,

Deputy Krauger had fulfilled his *Brady* obligations and cannot be held liable.  The facts alleged

fail to demonstrate a constitutional violation that can be attributed to Deputy Krauger, and he is

entitled qualified immunity as to this claim.

                        c.     James Paul Stevenson

      Law enforcement interviewed James Paul Stevenson several times in September 1999.

Of greatest significance to plaintiff's criminal trial, Stevenson stated that he normally parked at

the bottom of the hill on the Boyds' property and walked to Kinser's mobile home, because

Kinser did not want a lot of cars driving up to the mobile home at night.  LeGore Decl. Ex. 32.

Plaintiffs argue that this evidence is relevant to the credibility of Bimla Boyd, who stated that she

would have known if anyone arrived to the mobile home on foot.  Howell Decl. Ex. 23 at 29.

      Plaintiffs claim that the report containing Stevenson's interviews, which was authored by

Deputy Krauger on October 8, 1999, was never provided to defense counsel.  The Polk

County/City of Dallas defendants respond, pointing out that the report of Stevenson's interview is

Bates stamped, defense counsel interviewed Stevenson, and defense team listed Stevenson as an

investigative witness. LeGore Decl. Ex. 22, 23. In essence, defendants argue that, because defense counsel knew of Stevenson, the Stevenson report was not suppressed.

Like the court's analysis of the Gannaway Report, above, the presence of a Bates stamp is decisive. Because the report was Bates stamped, there is no genuine issue of material fact that the report was received by the District Attorney's Office. Therefore, even if defense counsel did not receive the report, the defendants in this case fulfilled their *Brady* obligations. *D'Ambrosio*, 747 F.3d at 389. The alleged facts do not demonstrate a constitutional violation that can be attributed to the Polk County/City of Dallas defendants, and they are entitled qualified immunity as to this claim.

### d.    Comparative Bullet Lead Analysis (CBLA) Evidence

Through law enforcement's investigative efforts, bullets were recovered from the murder victims, and bullets were recovered from the execution of a search warrant for plaintiff's home. In January 1999, Oregon Department of Justice Special Agent Kerry Taylor, in association with Assistant Attorney Generals Greg Nyhus and John Fisher, made a decision to send the two sets of bullets to Michael Conrady at Oregon State University for analysis. Howell Second Decl. [235] Ex. 7 at 10; Howell Third Decl. [240] Ex. 29 at 7. The analysis conducted by Conrady, called CBLA, concluded that the two sets of bullets were analytically indistinguishable. Conrady's testimony regarding the results was presented to the jury at plaintiff's criminal trial. After plaintiff's trial, it became widely accepted that CBLA is scientifically flawed. Howell Decl. Ex. 13. In fact, the evidence suggests that law enforcement was aware of the problems associated with CBLA before its use in plaintiff's criminal trial. LeGore, Decl. Ex. 24. During his deposition, Taylor explained that the prosecution may have requested that Oregon State

16- OPINION AND ORDER

University conduct the CBLA because they knew that the Oregon State Police Forensic Laboratory, who usually performed their forensic analysis, would not do it.  Howell Second Decl. [235] Ex. 7 at 11-12.

In this claim against the Polk County/City of Dallas defendants, plaintiffs allege that Deputy Krauger and Sheriff Wolfe were ultimately responsible for ensuring that all scientific evidence was reliable.  While plaintiffs do not identify a specific piece of evidence that defendants failed to disclose, they generally allege that the failure to provide exculpatory CBLA evidence to defense counsel was a *Brady* violation.

However, a *Brady* violation does not exist in a case in which the allegedly suppressed evidence is known by the defense.  *Williams v. Lambert*, 340 Fed. Appx. 364, 365 (9th Cir. 2009).  Here, plaintiff's defense counsel knew that CBLA was potentially unreliable.  In fact, he filed a pre-trial motion to exclude the CBLA evidence on that very basis.  LeGore Decl. Ex. 25.  Specifically, the motion reasoned that the methods used in the State's bullet analysis were not generally accepted by the scientific community.  Additionally, defense counsel had received the "Lukens Report," the primary evidence describing the criticisms of CBLA at the time.  LeGore Decl. Ex. 28.  Because plaintiff's defense counsel had evidence concerning the unreliability of CBLA, and plaintiffs have not identified specific evidence that was not produced, the court cannot find that any such evidence was suppressed.

Plaintiffs could argue that the fact that Oregon State Police Forensic Laboratory would not conduct CBLA was the exculpatory evidence that was not disclosed to defense counsel. However, it was the prosecution team that communicated with the crime lab regarding CBLA, not the police investigators.  LeGore Decl. Ex. 24.  Plaintiffs provide no evidence that the Polk

17- OPINION AND ORDER

County/City of Dallas defendants knew about the concerns related to CBLA's reliability. Accordingly, the defendants cannot be liable for failing to disclose those concerns. The facts alleged do not demonstrate a violation of plaintiffs' constitutional rights that can be attributed to the Polk County/City of Dallas defendants. Therefore, they are entitled qualified immunity as to this claim.

e.      February 2000 Crime Lab Report

On February 17, 2000, the Oregon State Police Forensic Laboratory received five guns for testing in connection with the triple homicide. Plaintiffs do not know, and the Polk County/City of Dallas defendants still have not explained, to whom the guns belonged. The crime lab drafted a supplemental report concerning the guns on February 25, 2000, just three days before the conclusion of plaintiff's criminal trial. The supplemental report was directed to the attention of Deputy Krauger. LeGore Second Decl. Ex. 39. Plaintiffs allege that Krauger violated *Brady* because he did not provide this supplemental report to defense counsel.

Plaintiffs' argument fails for two reasons. First, the Polk County District Attorney was carbon copied on the report. LeGore Second Decl. Ex. 39 at 2. Therefore, the investigating agency fulfilled its *Brady* obligations by providing the report to the prosecution, who is responsible for providing it to defense counsel. *D'Ambrosio,* 747 F.3d at 389. Second, the supplemental report is not exculpatory or impeachment evidence under *Brady*. It merely demonstrates that five guns were tested and none were the murder weapon. In light of that conclusion, the court fails to find the exculpatory or impeachment value of the report. Therefore, the facts alleged do not demonstrate that a constitutional violation occurred, and the Polk County/City of Dallas defendants are entitled qualified immunity as to this claim.

18- OPINION AND ORDER

f.      Property in Custody Sheets

Plaintiffs assert that Deputy Krauger, Deputy Box, Deputy Holsapple, Sheriff Steele, and

Sheriff Wolfe failed to produce the property in custody sheets, which detail the complete chain of

custody for the physical evidence gathered from the crime scene and plaintiff's home.  Plaintiffs

allege that defendants' failure to produce the property in custody sheets to defense counsel

constituted a *Brady* violation, because there are several gaps in the chain of custody that could

have served as impeachment evidence as to the credibility of the individual officers.

Plaintiffs' argument fails because they cannot demonstrate that the allegedly suppressed

evidence would have undermined confidence in the outcome of plaintiff's criminal trial, thus

failing to satisfy the third *Brady* factor.  The nature of property in custody sheets is different than

more typical exculpatory evidence, such as physical evidence recovered from a crime scene or a

witness' statement.  If the prosecution did not disclose a particular witness' exculpatory statement,

the defendant is prejudiced because he is unable to use that exculpatory statement during his

criminal trial, possibly undermining his conviction.  In contrast, property in custody sheets

merely describe the chain of custody for any physical evidence used at trial.  If a particular piece

of evidence did not have a complete chain of custody at the time of trial, it would not be admitted

into evidence over an objection.  Similarly, if there were a gap in the chain of custody, defense

counsel could use that gap to discredit the evidence during trial.  The lack of a complete chain of

custody would have been apparent to any defense counsel.  Accordingly, any failure to discredit

evidence on those grounds at plaintiff's trial, can only be attributed to defense counsel's

stratagem.  Defense counsel's stratagem cannot give rise to a valid *Brady* claim.  *Amado*, 758

F.3d at 1135.  To the extent that defense counsel did address chain of custody issues at plaintiff's

19- OPINION AND ORDER

trial, plaintiff has already received any benefit that a jury may have granted him in light of the gaps in the chain of custody, and the complete property in custody sheets would not undermine his conviction. As such, plaintiffs' alleged facts fail to demonstrate a constitutional violation, and defendants are entitled qualified immunity as to this claim.

      **2.**     *Trombetta/Youngblood* **Claims**

Plaintiffs' second category of federal claims involve allegations that the Polk County/City of Dallas defendants destroyed evidence, mishandled evidence, and failed to investigate potentially exculpatory evidence. Such allegations are analyzed within the scope of the Supreme Court's decisions in *California v. Trombetta*, 467 U.S. 479, 488 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

The destruction of evidence may violate due process when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488–89, 104; *United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) ("The exculpatory value of an item of evidence is not 'apparent' when the evidence merely '*could have*' exculpated the defendant"; finding digital surveillance video of robbery which was lost prior to trial far from clearly exculpatory) (citation omitted). However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58.

Bad faith is shown where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58. The

"presence or absence of bad faith turns on the government's knowledge of the apparent

exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Sivilla*,

714 F.3d 1168, 1172 (9th Cir. 2013) (quotation and citations omitted). A police department's

compliance with "departmental procedure" should be regarded as an indication that the disposal

of the subject evidence was not performed in "bad faith." *Mitchell v. Goldsmith*, 878 F.2d 319,

322 (observing, in the course of enumerating reasons for not finding bad faith, that "the police

were acting in accord with their normal practices").

Plaintiffs allege that several of the Polk County/City of Dallas defendants' actions

constitute *Trombetta/Youngblood* violations, and defendants argue that they are entitled to

qualified immunity for each. Below, the court will analyze each of those allegations under both

prongs of the qualified immunity test.

a.     Lost Trial Evidence

In September 2009, plaintiff was granted post-conviction relief, and he was returned to

Polk County Jail to await his re-trial. In December 2009, the Oregon Department of Justice

issued a report stating that the original trial exhibits were destroyed by Polk County. The result

was plaintiff's release from incarceration. In 2011, the original trial exhibits were found at the

offices of the Oregon Department of Justice. Plaintiffs argue that the Polk County/City of Dallas

defendants' failure to preserve the trial exhibits was a violation of plaintiffs' constitutional rights;

and therefore, a grant of qualified immunity is improper.

Plaintiffs' allegation fails to allege a constitutional violation for several reasons. First,

plaintiffs fail to demonstrate that the individually-named defendants were in any way responsible

for the misplaced trial exhibits.  In *Humphries v. County of Los Angeles*, parents who had been

arrested for child abuse but later found innocent brought a § 1983 claim against the state, county,

and individual officers of the county sheriff's department, alleging that their continued listing in

California's Child Abuse Central Index (CACI) violated their rights to procedural due process

because there was no available process to challenge that listing.  554 F.3d 1170 (9th Cir. 2009)

*rev'd on other grounds by Los Angeles County v. Humphries*, 562 U.S. 29 (2010).  Under a

discussion of qualified immunity for the individual officers, the Ninth Circuit explained that

"liability under § 1983 arises only upon a showing of personal participation by the defendant."

*Id.* at 1202 (citation and quotation omitted).  The Ninth Circuit held that, because the plaintiff

presented no evidence to suggest that the arresting officers were in any way involved in the

decision to list the plaintiffs in the CACI, they cannot be subject to liability.  *Id.*

In this case, plaintiffs agree that Polk County never regained possession of the exhibits

after plaintiff's criminal trial in February 2000.  Moreover, the trial exhibits were discovered in

the possession of the Oregon Department of Justice.  Therefore, if any valid

*Trombetta/Youngblood* claim exists regarding the preservation of trial exhibits, it is properly

directed at the Department of Justice - not the Polk County/City of Dallas defendants.

Moreover, the state's failure to preserve evidence is not a denial of due process unless that

loss of evidence prejudiced the defendant's case.  *United States v. Fairchild*, 24 F.3d 250 (9th

Cir. 1994) (citing *Youngblood*, 488 U.S. at 58; *Trombetta*, 467 U.S. at 488-09; *United States v.*

*Dring*, 930 F.2d 687, 693 (9th Cir. 1991)).  In this case, the misplacement of the original trial

exhibits resulted in the opposite of prejudice.  Instead, it is the reason that plaintiff's criminal

charges were dismissed and he was released.  Therefore, the facts do not demonstrate that a

22- OPINION AND ORDER

constitutional violation occurred, and the Polk County/City of Dallas defendants are granted

qualified immunity as to this claim.

b.    Red Lighter

On the day of the murders, there was a fire in the mobile home that originated from a

wood stove. The Fire Marshall concluded that the fire was suspicious in nature. During the

investigation, a red lighter was found on the kitchen table within ten feet of the wood stove.

Deputy Krauger seized the lighter and placed it into evidence with the Polk County Sheriff's

Office. In January 1999, Deputy Krauger discovered that the red lighter was missing from the

evidence locker. Sergeant Ruark explained to Deputy Krauger that he had found the lighter on

the floor adjacent to the locker that contained evidence related to the murder trial, and placed it in

his desk drawer. LeGore Decl. Ex. 40. Sergeant Ruark returned the lighter to Krauger, and he

placed it back into the evidence locker. The lighter was never tested for fingerprints prior to its

misplacement. Plaintiff alleges that the misplacement of the lighter violated

*Trombetta/Youngblood*, because the lighter could have possessed a fingerprint of the murderer

and plaintiff was unable to obtain any type of comparable evidence.

As stated above, the exculpatory value of an item of evidence is not "apparent" when the

evidence merely could have exculpated the defendant. *Drake*, 543 F.3d at 1090. The failure to

preserve *potentially useful* evidence is not a denial of due process unless the criminal defendant

can show bad faith on the part of police. *Youngblood*, 488 U.S. at 58. Negligence in failing to

preserve potentially useful evidence is not sufficient to constitute bad faith. *Youngblood*, 488

U.S. at 58; *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997); *United States v. Flyer*, 633

F.3d 911, 916 (9th Cir. 2011) ("Bad faith requires more than mere negligence or recklessness.").

23- OPINION AND ORDER

In this case, plaintiffs have not demonstrated that the misplacement of the lighter was caused by anything other than mere negligence. As such, the facts do not show that Deputy Krauger violated plaintiffs' constitutional rights when the lighter was misplaced, and he is entitled to qualified immunity as to this claim.

c.    Siding from the Mobile Home

After the Major Crimes Team had finished its work at the crime scene, Reserve Officer Woods discovered a small hole in the siding of the mobile home above where Graves' body was discovered. The hole appeared as though it may have been created by a small caliber bullet. Reserve Officer Woods conducted a search for the bullet that may have created the hole, but found nothing. He photographed the hole and cut out a two square-inch piece of metal from the siding of the mobile home that contained the hole. The piece of siding was subsequently lost and never logged into evidence.

Plaintiffs argue that the loss of the siding is a *Trombetta/Youngsblood* violation because the siding possibly possessed valuable forensic evidence and plaintiff was unable to obtain any comparable evidence. The Polk County/City of Dallas defendants argue that it is not a constitutional violation, because the evidence was not exculpatory; and therefore they did not act in bad faith in losing it. Plaintiffs argument fails because they offer nothing beyond conjecture to show that the siding contained exculpatory evidence. Moreover, the investigation recovered several bullets from the crime scene, which were made available to defense counsel. These bullets would constitute comparable evidence regarding the gun used at the crime. Finally, plaintiffs offer no evidence that the siding was lost in bad faith. Therefore, the loss of the siding was not a constitutional violation, and defendants are granted qualified immunity as to this claim.

24- OPINION AND ORDER

d.    Altered Evidence

On January 10, 2000, Deputy Krauger directed Deputy Holsapple to edit the video of the crime scene investigation. According to Deputy Holsapple's report, he copied "certain portions of the videotapes to VHS for use in court." LeGore Decl. Ex. 36 at 2. Then, he returned the original video and the edited video to Deputy Krauger for evidence storage. *Id.* While the edited crime scene video was used at the start of plaintiff's criminal trial, defendants concede that plaintiff never received the original crime scene video. Accordingly, plaintiffs allege that Deputy Krauger and Deputy Holsapple, as those responsible for maintaining the original video, violated *Trombetta/Youngblood* because the original crime scene video could have contained exculpatory evidence and plaintiff was unable to obtain comparable evidence.

Once again, plaintiffs fail to set forth any evidence that the original crime scene video was exculpatory. At best, the crime scene video was potentially exculpatory. Accordingly, plaintiffs are unable to demonstrate the government's knowledge of the apparent exculpatory value of the evidence at the time of editing in order to support a bad faith finding. *Sivilla*, 714 F.3d at 1172 (9th Cir. 2013). The lack of bad faith is apparent in light of the fact that law enforcement disclosed to defense counsel that the video was edited and an original copy existed. LeGore Decl. Ex. 36 (the report describing the video editing was stamped with a Bates number). Therefore, the facts do not demonstrate that the loss of the original crime scene video was a constitutional violation, and the Polk County/City of Dallas defendants are entitled qualified immunity as to this claim.

/ / /

e.    Failure to Investigate

Plaintiffs argue that Deputy Krauger, Deputy Holsapple, Sheriff Steele, and Sheriff Wolfe violated plaintiffs' constitutional rights when they failed to investigate certain potentially exculpatory evidence. First, plaintiffs claim that the officers improperly failed to treat Bimla Boyd as a suspect despite her inaccurate account of related events, her attempt to avoid service of a subpoena to testify at the criminal trial, and her subsequent conviction for murder. Second, plaintiffs claim that, in comparing suspects' fingerprints with six fingerprints that were discovered at the crime scene, Deputy Krauger mistakenly requested that the crime lab analyze the fingerprints of Jeremy A. Olsen - not Jeramy Olsen, who was at the Boyd property on the day of the murders.

Plaintiffs allege that these actions were violations of *Trombetta/Youngblood*. While defendants disagree that these claims are properly categorized as *Trombetta/Youngblood* claims, there are cases in which the Ninth Circuit analyzed law enforcement's failure to gather exculpatory evidence under the scope of *Trombetta/Youngblood*. *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003). In *Cunningham*, the plaintiff brought a § 1983 action against an investigating officer, alleging a violation of his due process rights in connection with a sexual abuse investigation. *Id.* The investigating officer conducted several interviews of possible victims of the defendant's sexual abuse, but he kept no record of those interviews. Additionally, the investigating officer failed to gather any physical evidence, such as bed sheets or clothing, which could have exonerated the defendant. *Id.* The Ninth Circuit reemphasized that "[a] police officer's failure to preserve or collect potential exculpatory evidence does not violate the Due Process Clause unless the officer acted in bad faith." *Id.* (citing *Youngblood*, 488

26- OPINION AND ORDER

U.S. at 58; *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989).  Then, the court explained that such facts are not specific or compelling enough to show bad faith.  The failure to document interviews did not demonstrate an improper motive.  *Id.*  Similarly, the failure to gather physical evidence does not show bad faith because the untested evidence is speculative.  *Id.*  The Ninth Circuit concluded, even if the investigator's work "may have been negligent or incomplete, it was not conducted in bad faith" and no constitutional violation occurred.  *Id.*

In this case, even assuming that plaintiffs' allegations are true, they do not demonstrate facts that rise above negligence.  While the investigators may not have unturned every stone that plaintiffs wish they had unturned, plaintiffs set forth no facts to support a finding of bad faith.  Therefore, the facts alleged do not demonstrate a constitutional violation, and defendants are entitled to qualified immunity as to this claim.

### 3.    Substantive Due Process Claims

Plaintiffs' third category of federal claims allege that the Polk County/City of Dallas defendants violated plaintiffs' rights to substantive due process.  Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with the rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal citations omitted)).

#### a.    Destruction of Cassette Tape

On November 24, 1998, plaintiff was interrogated by Oregon State Police Officer Michael Oja and City of Dallas Police Officer John Wallace.  During the interrogation, plaintiff

complained that Officer Oja was misquoting him, and requested that the officers play back his

remarks using the tape recorder that was in the interrogation room. According to State

defendants, the tape recorder was not being used, and City of Dallas Police Officer Wallace

threw it out of the room. Plaintiff alleges that the tape recorder had recorded his conversation

with the officers, and Officer Wallace broke it when he threw it, thereby destroying potentially

exculpatory evidence. Officer Oja's written report of the interview did not mention a tape

recorder.

Plaintiffs allege that Officer Wallace's deliberate destruction of the recording of plaintiff's

interrogation violates substantive due process because it shocks the conscience. While

defendants fail to raise this argument, this claim is more properly raised under specific

amendments to the U.S. Constitution as opposed to the more general concept of substantive due

process. "The specific guarantees of the first Eight Amendments stake out reliable limits to the

exercise of government authority in particular situations. Thus, where a particular amendment

provides an explicit textual source of constitutional protection against a particular sort of

government behavior, that Amendment, not the more generalized notion of substantive due

process, must be the guide for analyzing these claims." *Armendariz v. Penman*, 75 F.3d 1311,

1319 (9th Cir. 1996), *overruled in part on other grounds by Crown Point Dev., Inc. v. City of

Sun Valley*, 506 F.3d 851, 852-53 (9th Cir. 2007) (internal quotations omitted). "The scope of

substantive due process does not extend to areas addressed by other, more specific provisions of

the Constitution," *id.*, and accordingly, the court may limit its inquiry to the constitutional

amendment that specifically addresses plaintiffs' claims in lieu of analyzing general notions of

substantive due process, *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989). Moreover, the

Supreme Court has consistently emphasized its reluctance to broaden the concept of substantive

due process out of a concern that "the guideposts for responsible decisionmaking [by potential

defendants] in this unchartered area are scarce and open-ended." *Albright v. Oliver*, 510 U.S.

266, 271-72 (1994) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)).  Courts have

used this reasoning to analyze substantive due process claims for the failure to disclose

exculpatory evidence under *Brady*, rather than substantive due process.  *Moldowan v. City of*

*Warren*, 578 F.3d 351, 377 n.6 (6th Cir. 2009).  Therefore, this court will analyze the alleged

destruction of evidence under the more specific *Brady* and *Trombletta/Youngblood* standards.

Even if plaintiffs' allegations are true, and the interrogations had been recorded before

Officer Wallace destroyed the tape, the facts fall short of demonstrating a constitutional

violation.  As explained in detail above, a *Brady* violation does not exist in a case in which the

allegedly suppressed evidence is known by the defense.  *Williams,* 340 Fed. Appx. at 365.  It is

apparent that plaintiff knew what he said during the interrogation.  *Atkins v. County of Riverside*,

151 Fed. Appx. 501, 506 n.4 (9th Cir. 2005) (citing *Gauger v. Hendle*, 349 F.3d 354, 360 (7th

Cir. 2003) (No *Brady* duty of disclosure where defendant "knew what he had said in the

interrogation").  Similarly, a *Trombetta/Youngblood* violation exists only if the destroyed

evidence is of such a nature "that the defendant would be unable to obtain comparable evidence

by other reasonably available means." *Trombetta*, 467 U.S. at 488–89, 104.  Plaintiff's testimony

regarding his statements during the interrogation constitutes comparable evidence.  Therefore,

the facts alleged do not demonstrate that a constitutional violation occurred and Office Wallace is

granted qualified immunity as to this claim.

/ / /

29- OPINION AND ORDER

b.    Chain of Custody Issues

Plaintiffs allege that Deputy Krauger, Reserve Officer Woods, Deputy Holsapple, Deputy Box, Sheriff Steele, and Sheriff Wolfe, as those responsible for collecting and maintaining evidence, violated plaintiffs' substantive due process by failing to establish a chain of custody for certain pieces of evidence. Specifically, they allege that there were chain of custody issues related to the bullets recovered from the victims during the autopsy, the wood stove door, the red lighter, the piece of mobile home siding that contained a small hole, the five guns analyzed by the crime lab, the bullets collected from plaintiff's home, and the crime scene video. First, many of these issues were individually addressed by the court, above, and the court concluded that no constitutional violation occurred. Second, these chain of custody issues are not the type of conduct that shocks the conscience. Rather, plaintiff's defense counsel had the opportunity to utilize these chain of custody issues to suppress or discredit evidence presented in plaintiff's criminal trial. As such, the facts alleged do not demonstrate that defendants violated plaintiffs' rights to substantive due process and they are entitled to qualified immunity as to this claim.

c.    Cross-Contamination of Evidence

During an evidence review conducted by plaintiff's post-conviction relief attorney and investigator in February 2009, they discovered some photos from an unrelated case in plaintiff's file. The file that they were reviewing consisted of evidence that was not used during plaintiff's criminal trial. LeGore Decl. Ex. 18. Plaintiffs allege that this cross-contamination of evidence violated plaintiff's substantive due process rights. However, one instance of unrelated photos in a file with evidence that was not used in plaintiff's criminal trial cannot rise to the level of shocking the conscience. As such, the court finds no constitutional violation and defendants are

30- OPINION AND ORDER

granted qualified immunity as to this claim.

d.      Totality of the Circumstances

Plaintiffs allege that, regardless of the classification of a *Brady* claim or a

*Trombetta/Youngblood* claim, when reviewing the facts in the light most favorable to them, the

totality of circumstances supports a constitutional violation by the individually-named

defendants.  Plaintiffs contend that the sheer number of mistakes in the investigation, intentional

and/or unintentional, demonstrate a deliberate indifference that is sufficient to shock the

conscience.  Plaintiffs fail to cite any case law that supports such an extension of substantive due

process, and this court declines to do so.

### 4.      Familial Association Claims

In plaintiffs' Tenth, Eleventh, and Twelfth Claims, they allege that the individually-named

defendants deprived them of their Fourteenth Amendment associational rights through their

investigation and prosecution of Cannon.  "It is well established that a parent has a fundamental

liberty interest in the companionship and society of his or her child and that the state's

interference with that liberty interest without due process of law is remediable under [42 U.S.C. §

] 1983." *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (internal quotation marks

omitted); *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other*

*grounds by  Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999); *Kelson v. City of*

*Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1985)).  "[U]nwarranted state interference" with the

relationship between parent and child violates substantive due process. *Fontana*, 818 F.2d at

1418.

The Ninth Circuit addressed familial association claims in *Crowe v. County of San Diego*, 608 F.3d 406, 441 (9th Cir. 2010). In *Crowe*, a girl was murdered, and her brother and his friends were arrested and interrogated for the crime. *Id.* at 417. During the interrogations, the police officers coerced confessions from the boys, which were introduced in pre-trial proceedings, and resulted in the boys spending several months in jail while awaiting their trial. *Id.* at 425. After the charges were dismissed, the boys brought a § 1983 claim against the police for deprivation of familial companionship. The trial court dismissed these claims because the arrests were justified by probable cause. *Id.* at 441. The Ninth Circuit reversed, stating "the lack of familial companionship that the [boys] experienced was not due, in any significant part, to the boys' arrest; it was due to the boys' incarceration." *Id.* Accordingly, the Ninth Circuit concluded that "the relevant consideration is not whether the boys' [sic] were wrongfully arrested; it is whether they were wrongfully detained." *Id.*

In this case, plaintiffs may have a valid argument that the investigators did not have probably cause to arrest plaintiff on the day following the murders. However, on the day after plaintiff's arrest, officers conducted a legal search of his residence and discovered numerous firearms. There is no doubt that law enforcement had probable cause to detain plaintiff at that time for the crime of Felon in Possession of a Firearm. Therefore, his detainment was lawful.

During his detainment, law enforcement gathered additional evidence that they believed linked plaintiff to the murders. On December 3, 1998, plaintiff was indicted by grand jury for three counts of Aggravated Murder and for Felon in Possession of a Firearm. He remained in custody awaiting his criminal trial, but that detention was lawful, as evidenced by the grand jury's decision. On February 28, 2000, a jury found plaintiff guilty of all charges. Therefore, his

32- OPINION AND ORDER

subsequent detention was also effected by lawful process. Moreover, with respect to plaintiffs' previously dismissed false imprisonment claim, the Ninth Circuit already held that, "at all times, Cannon was held pursuant to legal process and, therefore, his confinement was lawful." *Cannon v. Polk County Dist. Attorney*, 501 Fed. Appx. 611, 613-14 (9th Cir. 2012). Accordingly, the alleged facts do not demonstrate that a constitutional violation occurred, and defendants are entitled to qualified immunity as to plaintiffs' Tenth, Eleventh, and Twelfth Claims.

**B.    State Claims Against the Polk County/City of Dallas Defendants (Claims 1 and 2)**

Plaintiffs allege two state law claims against Polk County and the City of Dallas. First they allege that Polk County and the City of Dallas engaged in malicious prosecution. Second, they allege that Polk County and the City of Dallas engaged in abuse of process.

**1.    Malicious Prosecution**

The parties agree that, to prevail on a claim of malicious prosecution, plaintiff must prove the following:

(1)    the institution or continuation of the original criminal proceedings;
(2)    by or at the insistence of the defendant;
(3)    termination of such proceedings in the plaintiff's favor;
(4)    malice in instituting the proceedings;
(5)    lack of probable cause for the proceedings; and
(6)    injury or damage because of the prosecution.

*Blandino v. Fishel*, 179 Or. App. 185, 190-91 (2002).

Plaintiffs' claim for malicious prosecution fails for two reasons. First, the criminal proceedings were not terminated in plaintiff's favor, as required by the second factor. In Oregon,

33- OPINION AND ORDER

"the voluntary dismissal of an underlying action before a trial on the merits is favorable to the defendant if it reflects adversely on the merits of the underlying action." *Portland Trailer & Equip., Inc. v. A-1 Freeman Moving & Storage, Inc.*, 49 P.3d 803, 808 (Or. App. 2002). The dismissal of the charges against plaintiff in no way reflected the merits of the prosecution's case. Plaintiff's case was dismissed solely because the original trial exhibits were misplaced after the appeals process, and the Department of Justice could not present the missing evidence in his re-trial. Before it was misplaced, plaintiff was indicted and convicted on much of that same evidence. Therefore, under the meaning applied by Oregon courts, the criminal proceedings were not terminated in plaintiff's favor.

Second, defendants had probable cause to initiate the proceedings. Plaintiffs attempt to argue that defendants had insufficient evidence to arrest plaintiff on the day following the murders. While plaintiffs may have a valid argument that probable cause to arrest did not exist at that time, to succeed on a claim for malicious prosecution, plaintiff must prove that defendants lacked probable cause "to prosecute the action." *SPS of Oregon v. GDH, LLC*, 309 P.3d 178, 183 (Or. App. 2013) (citation omitted). Probable cause, in the malicious prosecution context, means that the person initiating the civil action "reasonably believes" that he or she has a good chance of prevailing—that is, he or she has an objectively reasonable, subjective belief that the claim has merit. *Id.* (citing *Pereira v. Thompson*, 217 P.3d 236, 258 (Or. App. 2009)).

Before proceeding with plaintiff's indictment, defendants had significant evidence implicating defendant of both the firearms charges and the murder charges. Investigators knew that plaintiff was the last person seen at the crime scene before the murders. They had obtained statements from Olsen and Weaver, which described plaintiff preventing them from entering the

34- OPINION AND ORDER

mobile home and acting strangely. They knew that plaintiff was at the mobile home to do

plumbing work, and two victims were discovered under the mobile home in the location of the

plumbing work. Law enforcement knew that plaintiff was a methamphetamine user, and one of

the victims was a methamphetamine cook. They knew that plaintiff was in possession of sixteen

thousand dollars that was meant to be spent on one of the victims. Upon interviewing defendant,

law enforcement learned that he was untruthful about his acquaintance with the victims, his drug

use, and the sixteen thousand dollars. Upon searching his residence, police found several

firearms, home-made silencers, and bullets of the same caliber used at the crime scene. In sum,

there no doubt that the police had probable cause to prosecute defendant for the felon in

possession of firearms charge. It is also objectively reasonable that the felon in possession and

the aggravated murder charges had merit. Finally, the individual officers had a subjective belief

that the claims had merit. *See e.g.*, Holsapple Decl. ¶ 18; Krauger Decl. ¶ 7; Steel Decl. ¶ 5.

Therefore, defendants had probable cause to prosecute the action. Because plaintiffs cannot

satisfy two factors of the malicious prosecution test, defendants are granted summary judgment

as to this claim.

### 2.    Abuse of Process

The parties agree that, under Oregon law, abuse of process is "the perversion of legal

procedure to accomplish an ulterior purpose when the procedure is commenced in proper form

and with probable cause." *Larsen v. Credit Bureau*, 568 P.2d 657, 658 (1977) (quoting *Kelly v.*

*McBarron*, 482 P.2d 187, 190 (1971)). Thus, to prevail on an abuse of process claim, a plaintiff

must prove some ulterior purpose, unrelated to the process, and a willful act in the use of the

process that is not proper in the regular conduct of the proceeding. *Id.* In this case, plaintiffs

35- OPINION AND ORDER

have set forth no facts that demonstrate that the investigators were motivated by ulterior purposes. Therefore, they have failed to satisfy their burden on summary judgment.

## The State Defendants' Motion for Summary Judgment

Plaintiffs have five surviving claims against the Oregon Department of Justice Special Agent Kerry Taylor and Oregon State Police Officer Michael Oja, pursuant to 42 U.S.C. § 1983. Plaintiffs' Fifth Claim alleges that Taylor violated Cannon's Fourth and Fourteenth Amendment rights through the loss and/or destruction of evidence; failure to investigate exculpatory evidence; withholding discovery from defense counsel; altering evidence; cross-contamination of evidence; failure to properly collect, document, store, photograph, videotape, and memorialize evidence; failure to properly investigate information presented to law enforcement; and failure to supervise. Plaintiffs' Eighth Claim alleges that Officer Oja violated his Fourteenth Amendment rights when Oja mishandled evidence, cross-contaminated evidence, and allowed evidence to be destroyed. Plaintiffs' Tenth, Eleventh, and Twelfth Claims allege that Taylor and Oja violated the Fourteenth Amendment rights of Phillip Scott Cannon, Mathias Cannon, and QC, respectively, through a deprivation of their associational rights.

The court addressed plaintiffs' claims as to associational rights, above. That analysis is unchanged as applied to Taylor and Oja. Therefore, summary judgment is granted in the State defendants' favor as to plaintiffs' Tenth, Eleventh, and Twelfth Claims. Plaintiffs' Fifth and Eighth Claims as to Taylor and Oja are addressed below.

### A.    Special Agent Kerry Taylor

Kerry Taylor was employed as a special agent with the Oregon Department of Justice,

Criminal Division at the time of the murders. After plaintiff was indicted on December 3, 1998, the Polk County District Attorney's Office requested assistance from the Oregon Department of Justice. Taylor was asked to assist Greg Nyhus, an assistant attorney general, in investigating and preparing the case for trial. As an investigator, Taylor handled the physical evidence in the case. As described above, Taylor made the request that Michael Conrady at Oregon State University conduct CBLA to determine whether the bullets found at the crime scene and the bullets found in plaintiff's garage were manufactured in the same batch. During his deposition, Taylor explained that the prosecution may have requested that Oregon State University conduct the CBLA because they knew that the Oregon State Police Forensic Laboratory would not do it.

Plaintiffs broadly allege that Taylor's involvement in requesting the CBLA violated their constitutional rights. In response, the State defendants argue that Taylor is entitled to both absolute immunity and qualified immunity.

### 1.    Absolute Immunity

A prosecutor is entitled to absolute immunity from liability under § 1983 for violating a person's constitutional rights "when performing the traditional functions of an advocate." *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997). However, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Instead, absolute immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Kalina*, 522 U.S. 118 at 127. Accordingly, investigative functions carried out pursuant to the preparation of a prosecutor's case also enjoy absolute immunity. *Freeman v. Hittle,* 708 F.2d 442, 443 (9th Cir. 1983) (citations omitted). In other words, investigators who are assisting prosecutors in their role as a judicial advocate may

37- OPINION AND ORDER

be entitled to absolute immunity.

In analyzing "the nature of the function performed," the essential question for the court to answer is whether the allegedly unconstitutional act was "intimately associated with the judicial phase of the criminal process." *Genzler v. Longanbach*, 410 F.3d 630, 637 (9th Cir. 2005) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *Kalina*, 522 U.S. at 125; *Buckley,* 509 U.S. at 270; *Burns v. Reed*, 500 U.S. 478, 479 (1991)).  If the action was part of the judicial process, such as evaluating evidence and interviewing witnesses in preparation for trial, the investigator is entitled to the protection of absolute immunity whether or not he violated the plaintiff's constitutional rights. *Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003).  On the other hand, when an investigator engages in police-type investigative work, such as searching for clues and corroboration that may give him probable cause, he may be entitled to qualified immunity only. *Buckley*, 509 U.S. at 273.

The Supreme Court has avoided creating a bright-line rule for lower courts to distinguish actions intimately associated with the judicial process and actions that constitute police-type investigative work. *Genzler*, 410 F.3d at 637.  The Court has established that a prosecutor or investigator is not acting in an advocacy role before he has probable cause to arrest someone. *Buckley*, 509 U.S. at 274.  However, the Court has also explained that "a determination of probable cause does not guarantee a prosecutor absolute immunity for liability for all actions taken afterwards.  Even after that determination ... a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n. 5.  In sum, the determination that this court must make is whether Taylor's alleged actions were of the type normally done by police, in which case he enjoys only qualified immunity, or whether his actions

38- OPINION AND ORDER

were bound up with the judicial process, thus affording him the protection of absolute immunity. *Genzler,* 410 F.3d at 630.

First, it is instructive to note the timing of Taylor's decision to conduct CBLA. *Genzler*, 410 F.3d at 639 ("The timing of evidence gathering is a relevant fact in determining how closely connected that conduct is to the official's core advocacy function in the judicial process, and thus informs the inquiry into whether the official's conduct is protected by absolute immunity"). Taylor was not assigned to work on plaintiff's case until January 1999, and the decision to conduct CBLA was made at some point afterward. Law enforcement had determined that they had probable cause for plaintiff's arrest on November 24, 1998, and plaintiff was indicted by grand jury for three counts of aggravated murder on December 3, 1998. Based on this timing, the decision to conduct CBLA does not appear to be made in an attempt to gather evidence to inform a probable cause determination, which would support the denial of absolute immunity pursuant to *Buckley*, 509 U.S. at 273. Rather, the decision was made long after law enforcement had established probable cause and even after a grand jury confirmed that determination. Therefore, the timing of Taylor's allegedly unconstitutional acts weighs in favor of absolute immunity.

Nonetheless, plaintiffs rely on *Buckley* to support the argument that Taylor's actions are investigatory and not entitled absolute immunity. The court agrees with plaintiff in that the facts in *Buckley* are analogous to the facts at issue; however, the court does not agree that it demands a denial of absolute immunity. In *Buckley*, law enforcement discovered a boot print made by the murderer as he kicked in the door of the house in which he committed his crime. 509 U.S. at 262. The prosecutors retained three experts who were unable to make a connection between the boot print and the murder defendant's boots. *Id*. Then, the prosecutors finally obtained a positive

39- OPINION AND ORDER

identification from a fourth expert, who was allegedly well known for her willingness to fabricate evidence. *Id.* The murder defendant brought civil claims against the prosecutors for fabrication of evidence, and the prosecutors argued that they were entitled absolute immunity.

In determining whether the prosecutors' fabrication of evidence was entitled absolute immunity, the Supreme Court focused on employing a "functional approach," which "looks to the nature of the function performed." *Id.* at 269 (quotations omitted). Based on the fact that the prosecutors did not contend that they had probable cause at the time of the boot print analysis, the Court found that the function of that analysis was to establish probable cause. *Id.* at 274. The Court emphasized that a special grand jury was empaneled to conduct a more thorough investigation of the crime even after the boot print analysis was completed. *Id.* at 275. Therefore, it was the function of the analysis to determine probable cause in the early stages of an investigation that persuaded the Supreme Court to deny absolute immunity.

It is the timing and function of the conduct in this case that distinguishes it from *Buckley*. As explained above, law enforcement in this case had made a probable cause determination long before the bullet analysis was requested. Moreover, a grand jury had already indicted plaintiff for the crimes charged. Therefore, the function of the bullet analysis was not to collect evidence to establish probable cause. Rather, the function was to gather evidence to prepare a prosecutor for trial.

The Ninth Circuit has concluded that gathering evidence after an indictment is an act that may enjoy absolute immunity. In *KRL v. Moore*, the plaintiff sued prosecutors and an investigator for constitutional violations in connection with three searches conducted on its property. 384 F.3d 1105, 1108 (9th Cir. 2004). After the first search warrant was executed, the

40- OPINION AND ORDER

prosecutors obtained an indictment. *Id.* Two months later, law enforcement obtained a second warrant, which sought evidence to prosecute the pending indictment. *Id.* at 1111. The Ninth Circuit found that "to the extent the second search warrant sought evidence to prosecute the crimes charged in the indictment, [the prosecutors'] review of the warrant ... was intimately associated with the judicial process." *Id.* at 1112. Additionally, the court held that the investigator was entitled to absolute immunity for his reliance on the second search warrant to gather evidence to support the pending prosecution. *Id.* at 1113 ("[A]n investigator gathering evidence, a month after an indictment was filed, to prepare the prosecutor for trial is engaged in an advocacy function intimately associated with the judicial process."). *Id.*

This court finds the facts of *KRL* analogous to the facts of the present case. Taylor requested the comparison of the bullets after plaintiff's indictment. The function of the analysis was to gather evidence to support the prosecution of the crimes charged in the indictment. Therefore, much like the investigator in *KRL*, Taylor was assisting a pending prosecution.

Most persuasive is the Ninth Circuit's ruling in plaintiff's appeal of this court's ruling on State defendants' Motion to Dismiss. In that appeal, plaintiff argued that Assistant Attorney General Nyhus violated his constitutional rights when he sought out an expert to conduct CBLA. This court and the Ninth Circuit held that, Nyhus' actions were "in furtherance of the prosecution" and "not investigative." *Cannon ,* 501 Fed. Appx. at 613. Plaintiff now complains that the same actions, though taken by Taylor, violated his constitutional rights. As explained above, absolute immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Kalina,* 522 U.S. 118 at 127. Therefore, Taylor should be analyzed no differently than Nyhus when plaintiff's allegations involve the same action. Accordingly,

41- OPINION AND ORDER

Taylor is entitled to absolute immunity for his actions related to obtaining CBLA evidence.[3]

## 2.    Qualified Immunity

In addition to the claims related to CBLA, plaintiffs allege that Taylor violated plaintiffs' constitutional rights because he participated in the chain of custody of physical evidence, which contained gaps. Taylor is entitled to qualified immunity for his involvement in the chain of custody of physical evidence. As explained above in relation to the same claim against the Polk County/City of Dallas defendants, plaintiffs' chain of custody claims do not describe the type of conduct that shocks the conscience. Rather, plaintiff's defense counsel had an apparent opportunity to utilize these chain of custody issues to suppress or discredit evidence presented in plaintiff's criminal trial. As such, plaintiff was not prejudiced by the gaps in the chain of custody and the facts alleged do not demonstrate that a constitutional violation occurred. Therefore, Taylor is entitled to qualified immunity as to this claim.

## B.    Officer Oja

Plaintiff's interrogation, on November 24, 1998, lasted over eight hours through the middle of the night with minimal breaks and no food. As explained above, plaintiff complained that Oregon State Police Officer Oja was misquoting him, and requested that the officers play back his remarks using the tape recorder that was in the interrogation room. According to State defendants, the tape recorder was not being used, and City of Dallas Police Officer Wallace

---

[3] The court finds it essential to note that, while a finding of absolute immunity is demanded by Ninth Circuit precedent, including the Ninth Circuit's holding with respect to Assistant Attorney General Nyhus in this case, the facts here suggest that the prosecution team engaged in a type of "witness shopping" that may have violated Cannon's constitutional rights and impeded the pursuit of justice. This court in no way condones the prosecution team's conduct.

threw it out of the room.  Plaintiff alleges that the tape recorder had recorded his conversation

with the officers, and Officer Wallace broke it when he threw it, thereby destroying potentially

exculpatory evidence.  Officer Oja's written report of the interview did not mention a tape

recorder.  Plaintiffs allege that Officer Oja violated Cannon's constitutional rights by failing to

record his interrogation and failing to report the destruction of the interrogation tape.

On November 25, 1998, Officer Oja participated in the execution of a search warrant on

plaintiff's home.  During the search of plaintiff's garage, Officer Oja found live .22 caliber

bullets.  In the days following the search, Officer Oja found a live .22 caliber bullet in his pocket.

Before plaintiff's pretrial hearing in August 1999, Officer Oja submitted to evidence a bullet that

he believed was the bullet from plaintiff's garage.  The bullet was not used by the prosecution

during plaintiff's criminal trial, but it was used by the defense in an attempt to discredit the

murder investigation.  Plaintiffs allege that Officer Oja violated Cannon's constitutional rights by

failing to submit the .22 bullet into evidence directly after its discovery

Plaintiffs argue that these actions "shock the conscience" and therefore violate plaintiff's

Fourteenth Amendment right to due process.  However, plaintiffs cite to no case that even

suggests that the police violate constitutional rights when they fail to promptly log evidence.  It is

important to note that Officer Oja's failure to promptly log the bullet into evidence was disclosed

to defense counsel, who used it to impeach Oja's credibility.  Plaintiffs also fail to direct the court

to a case that suggests that the police violate constitutional rights when they refuse to record an

interrogation.  Rather, it appears to be typical law enforcement practice to first conduct an

unrecorded interview and then record a summarized and complete statement afterward.  LeGore

Second Decl. Ex. 48 at 7 (deposition of Wallace in which he states that it is his general practice

43- OPINION AND ORDER

to record a complete statement at the end of an interrogation).  In fact, plaintiffs' own investigator employs this same practice.  LeGore Second Decl. Ex. 57 at 6 (deposition of Eric Mason in which he describes his interview practice).    Accordingly, this is not the type of conduct that shocks the conscience.  The facts alleged do not demonstrate a constitutional violation; therefore, Officer Oja is granted qualified immunity.

## CONCLUSION

For the foregoing reasons, the Polk County/City of Dallas defendants' Motion for Summary Judgment [203] is GRANTED, and the State defendants' Motion for Summary Judgment [201] is GRANTED.

IT IS SO ORDERED.

DATED this  18  day of December, 2014.

Ancer L. Haggerty
United States District Judge